CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
DEC 19 2007
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| MAUREEN BRYANT,<br>        *Plaintiff,*<br><br>v.<br><br>WASHINGTON MUTUAL BANK,<br><br>HOWARD BIERMAN, AND<br><br>BIERMAN, GEESING, & WARD, LLC<br>        *Defendants.* | CIVIL NO. 6:07cv00015<br><br><br><br>MEMORANDUM OPINION<br><br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Defendants' Amended Motion to Dismiss Plaintiff's Second Amended Complaint (docket entry no. 43). Defendants' motion is pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) and argues that Plaintiff's Second Amended Complaint ("Complaint") fails to state a claim upon which relief can be granted. Accepting all factual allegations in Plaintiff's complaint as true and drawing all reasonable inferences in her favor, I find that Plaintiff has pled insufficient facts to support her claims. Accordingly, Defendants' Amended Motion to Dismiss Plaintiff's Second Amended Complaint will be GRANTED in an Order accompanying this Memorandum Opinion.

## BACKGROUND

This case arises out of Plaintiff's attempt to pay off the mortgage on her home, which was held by Defendant Washington Mutual Bank,[1] with a $244,663.79 "Bill of Exchange drawn on a Contract Trust Account[,] which is approved by and administered by or through the

---

[1] In her Complaint, Plaintiff names "Washington Mutual Corporation," which, according to Defendants, is a non-existent entity. However, pursuant to Federal Rule of Civil Procedure 21, I have entered an Order adding "Washington Mutual Bank" as a Defendant to this action and dropping "Washington Mutual Corporation."

Analysis and Control Division of the IRS."[2] (Second Am. Compl. ¶ 80.) According to Plaintiff's Complaint, Washington Mutual initially told her that the Bill of Exchange had been lost but eventually informed her that it was an unacceptable form of payment. Washington Mutual did not, however, return the Bill of Exchange to Plaintiff.

Finding that Plaintiff and her husband, who were joint-borrowers, were in default, Washington Mutual initiated foreclosure proceedings on the property and contracted with Defendant Bierman, Geesing & Ward, LLC to perform the foreclosure sale.[3] Following the foreclosure sale, Plaintiff filed the instant action, in which she proceeds *pro se*.

## STANDARD OF REVIEW

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). In considering a Rule 12(b)(6) motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See id.* at 244; *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254–55 (W.D. Va. 2001).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964–65 (2007) (alteration in original omitted) (citations omitted) (internal quotation marks omitted). Instead, "factual allegations must be enough to raise a right to relief above the speculative level on the

---

[2] Plaintiff's filings make abundant and creative use of capitalization, underlining, and bold fonts. Quotations from those filings will be altered as needed to be consistent with standard typeface conventions.
[3] Defendant Howard Bierman is a partner in Bierman, Geesing & Ward, LLC whom Plaintiff dealt with during the foreclosure process.

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face"; plaintiffs must "nudge[] their claims across the line from conceivable to plausible" or "their complaint must be dismissed." *Id.* at 1974. As the Fourth Circuit has held, a plaintiff "must sufficiently allege facts to allow the Court to infer that all elements of each of his causes of action exist." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344–45 (4th Cir. 2006).

Because *pro se* complaints "represent the work of an untutored hand requiring special judicial solicitude," courts must "construe *pro se* complaints liberally." *Baudette v. City of Hampton*, 775 F.2d 1274, 1277–1278 (4th Cir. 1985). Fourth Circuit precedent "expresse[s] the indisputable desire that those litigants with meritorious claims should not be tripped up in court on technical niceties." *Id.* at 1277–78 (citation omitted). Courts need not, however, "conjure up questions never squarely presented to them. . . . Even in the case of *pro se* litigants, they cannot be expected to construct full blown claims from sentence fragments." *Id.* at 1278.

## DISCUSSION

With her Complaint, Plaintiff asks the Court to award her "a clear title to her home," as well as attorney's fees, costs, expenses, and interest. Plaintiff bases her claim of entitlement to this relief on three alleged causes of action: breach of contract, intentional infliction of emotional distress, and conspiracy. I will address each of these in turn.

### *Count One: Breach of Contract*

Plaintiff's claim for breach of contract relies on language in the Deed of Trust, which secured the loan to Plaintiff and her husband, that "[p]ayments are deemed received by Lender

- 3 -
Case 6:07-cv-00015-NKM   Document 61   Filed 12/19/07   Page 3 of 14   Pageid#: 497

when received at the location designated in the Note or at such other location as may be designated by Lender . . . ." (Deed of Trust 4.)[4] Plaintiff asserts that payment, in the form of the Bill of Exchange for $244,663.79, "was received at the location designated by the lender on November 20, 2006."[5] (Second Am. Compl. ¶ 31.) Plaintiff therefore concludes that "[s]ince the payment was received at the designated location, this loan is paid off." (*Id.* ¶ 37.) By nonetheless foreclosing on Plaintiff's home, Plaintiff alleges that Defendants were in breach of the agreement contained in the Deed of Trust.

Under Virginia law,[6] the elements of a claim for breach of contract are: (1) a duly executed and enforceable agreement; (2) the plaintiff's performance, or offers to perform, in accordance with the terms of the contract; (3) the defendant's breach or failure to perform under

---

[4] Although permitted to do so by Federal Rule of Civil Procedure 10(c), Plaintiff has not attached a copy of the Deed of Trust to her Complaint or any of her other filings. Rather, a copy was attached as an exhibit to one of Defendants' filings. (Defs.' Reply Pl.'s Resp. Defs.' Mot. Extension Time, Ex. 2.) In general, material extrinsic to the complaint may not be considered on a Rule 12(b)(6) motion to dismiss without converting it to a Rule 56 motion for summary judgment, but there are certain exceptions this rule. As the Second Circuit has explained:

> The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.
> . . . [G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. Accordingly, where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated. . . . [O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit. Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations, alterations in original, and internal quotation marks omitted); *see also New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir. 1994) (citing *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)); *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 984 n.1 (D. Md. 2002); 5A Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 1327 & n.7 (3d ed. 2004) (citing cases).

[5] The Promissory Note signed by Plaintiff and her husband states that they borrowed $236,000. (Deed of Trust 2.) Although Plaintiff does not specifically allege it, I will assume without deciding that at the time of the alleged payment, $244,663.79 would have been sufficient to pay off the balance of the loan.

[6] The Deed of Trust states that it "shall be governed by Federal law and the law of the jurisdiction in which the Property is located." (Deed of Trust 10.)

- 4 -

the agreement; and (4) actual damages sustained by the plaintiff that are recoverable under Virginia law. *Carley Capital Group v. Newport News*, 709 F. Supp. 1387, 1396 (E.D. Va. 1989). Construing Plaintiff's Complaint liberally, it appears that she has alleged the existence of each of these elements.

As I explained, however, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1959. Instead, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face"; she must "nudge[ her] claims across the line from conceivable to plausible." *Id.* at 1974. It is on this point that Plaintiff's claim must fail because under the facts alleged, her claim that tendering the Bill of Exchange amounted to legitimate performance of the contract is highly implausible.

This is not to say that Bills of Exchange are by definition illegitimate. Their use as negotiable instruments appears to have been common in the nineteenth and early twentieth centuries; indeed, one of Joseph Story's lesser-known works is his *Commentaries on the Law of Bills of Exchange* (1843). The term also appears on occasion in modern cases, usually in connection with international transactions. *See, e.g., Gathercrest Ltd. v. First Am. Bank & Trust*, 649 F. Supp. 106, 109–13 (M.D. Fla. 1985). Moreover, the term "bill of exchange" can simply be a synonym for a "draft," such as a check. *Black's Law Dictionary* (8th ed. 2004) (defining the term "draft").

The problem for Plaintiff is that she has not alleged facts that would allow me to infer that *her* Bill of Exchange is a legitimate negotiable instrument; indeed, the facts she alleges lead to the opposite inference.[7] The details of Plaintiff's claim that the Bill of Exchange is a

---

[7] Neither party has provided the Court with a copy of the Bill of Exchange. Therefore, I base my conclusions on Plaintiff's explanation of its nature in her Complaint, as well as on several documents filed with the Court on which Plaintiff relied in bringing her suit.

- 5 -
Case 6:07-cv-00015-NKM    Document 61    Filed 12/19/07    Page 5 of 14    Pageid#: 499

negotiable instrument are largely impenetrable and nonsensical. Nevertheless, to the extent that they are comprehensible, I will endeavor to set forth a basic summary of the major points.

The foundation of Plaintiff's claim is equal parts revisionist legal history and conspiracy theory. Supposedly, prior to the passage of the Fourteenth Amendment, there were no U.S. citizens; instead, people were citizens only of their individual states. Even after the passage of the Fourteenth Amendment, U.S. citizenship remains optional. The federal government, however, has tricked the populace into becoming U.S. citizens by entering into "contracts" embodied in such documents as birth certificates and social security cards. With these contracts, an individual unwittingly creates a fictitious entity (i.e., the U.S. citizen) that represents, but is separate from, the real person.[8] Through these contracts, individuals also unknowingly pledge themselves and their property, through their newly created fictitious entities, as security for the national debt in exchange for the benefits of citizenship. However, the government cannot hold the profits it makes from this use of its citizens and their property in the general fund of the United States because doing so would constitute fraud, given that the profits technically belong to the actual owners of the property being pledged (i.e., the real people represented by the fictitious entities). Therefore, the government holds the profits in secret, individual trust accounts, one for each citizen.

Because the populace is unaware that their birth certificates and such are actually contracts with the government, these contracts are fraudulent. As a result, the officers of government are liable for treason unless they provide a remedy that allows an individual to recover what she is owed—namely, the profits held in her trust account, which the government has made from its use of her and her property in the commercial markets. In 1933, the

---

[8] Further thickening the plot, the name of the fictitious entity is the real person's name in all-capital letters, which apparently explains why names are commonly written in all-capital letters on birth certificates, driver's licenses, and other government documents.

- 6 -
Case 6:07-cv-00015-NKM   Document 61   Filed 12/19/07   Page 6 of 14   Pageid#: 500

government provided just such a remedy with House Joint Resolution 192,[9] and the Uniform Commercial Code (UCC) provides the means for a person to implement it. The fact that virtually no one is aware of this remedy or how to use it is all part of the government's scheme—if no one takes advantage of the remedy, the government can keep the money, so it is in the government's interest that the remedy be obscure. However, one such as Plaintiff, who learns of and is able to implement the remedy, can supposedly use the debt owed to her by the government to discharge her debts to third parties with Bills of Exchange that are drawn on her trust account.

Thus, Plaintiff undertook the arduous process of implementing the supposed remedy, a process its adherents sometimes refer to as "redemption." This consisted primarily of filing various UCC Financing Statements (Forms UCC1 and UCC3) with the Secretaries of State of both Michigan and Virginia.[10] In these financing statements, Plaintiff lists herself as both the secured party and the debtor, her apparent intent being to register a security interest in the fictitious entity that was created by her birth certificate and other government documents (i.e., the U.S. citizen "MAUREEN FRANCES BRYANT").[11] In addition, Plaintiff mailed a copy of a

---

[9] House Joint Resolution 192 bears the heading, "To assure uniform value to the coins and currencies of the United States," and states, in essence, that obligations requiring payment "in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby" are against public policy, and that U.S. currency is legal tender for all debts. H.R.J. Res. 192, 73d Cong. (1933). Plaintiff has also cited, without elaboration, *Guaranty Trust Co. of N.Y. v. Henwood*, 307 U.S. 247 (1939). (Compl., Ex. E.) In *Henwood*, the Court held that the Joint Resolution forbade the enforcement of a provision in certain contracts that payment of a debt was to be made in Dutch guilders, and that the Joint Resolution did not violate the Fifth Amendment. *Henwood*, 307 U.S. at 258–59. The Court also explained that with the Joint Resolution, "Congress sought to outlaw all contractual provisions which require debtors, who have bound themselves to pay United States dollars, to pay a greater number of dollars than promised. The Resolution intended that debtors under obligation to pay dollars should not have their debts tied to any fixed value of particular money, but that their entire obligations should be measured by and tied to the actual number of dollars promised, dollar for dollar." *Id.* at 258. What any of this has to do with a supposed remedy for governmental fraud is entirely unclear.

[10] Plaintiff also filed various other documents with government authorities. Much like the explanations of the supposed historical and legal bases for the "redemption" process, most of these documents use obfuscating, quasi-legalistic language to create a façade of legitimacy but in substance lack any actual basis in law.

[11] This no doubt explains the odd captions of Plaintiff's filings, in which, above the expected "MAUREEN BRYANT, PLAINTIFF," she inserts the phrase "Maureen-Frances:Bryant, lawful woman, neutral intervening third party." Plaintiff adds in her Complaint that "Maureen-Frances:Bryant has a perfected security interest in MAUREEN FRANCES BRYANT." (Second Am. Compl. ¶ 3.) Presumably, Plaintiff intends to suggest that her

"UCC3 claim" and the original Bill of Exchange to the U.S. Secretary of the Treasury. After receiving the signed certified mail return receipt, Plaintiff then sent a copy of the Bill of Exchange to Washington Mutual along with "simple processing instructions so that the funds could be fed-wired to them by the Treasury." (Second Am. Compl. ¶ 40.) According to Plaintiff, "this transaction has already been approved by Treasury," and Washington Mutual's failure to follow the processing instructions "is the only reason that [it] has not received the funding of the Bill of Exchange." (*Id.*)

Thus viewed in its entirety, Plaintiff's claim that her Bill of Exchange is a legitimate negotiable instrument is clearly nonsense in almost every detail. Most importantly, the alleged legal bases for her claim, House Joint Resolution 192 and *Guaranty Trust Co. of New York v. Henwood*, 307 U.S. 247 (1939), address nothing more than the U.S. monetary shift away from the gold standard and provide absolutely no support for her position. Neither mentions nor even alludes to secret trust accounts, a remedy for governmental fraud, Bills of Exchange, the UCC, or any of the other implausible elements of Plaintiff's claim.

In short, the legal authorities Plaintiff cites and the facts she alleges suggest that she did not tender payment, but rather a worthless piece of paper. Other courts addressing claims nearly identical to Plaintiff's have found likewise. *See U.S. Bank, N.A. v. Phillips*, 852 N.E.2d 380, 381–82 (Ill. App. Ct. 2006); *McElroy v. Chase Manhattan Mortg. Corp.*, 36 Cal. Rptr. 3d 176, 177–80 (Cal. Ct. App. 2005); *cf. United States v. Williams*, 476 F. Supp. 2d 1368, 1372 (M.D. Fla. 2007); *Rasheed v. Comerica Bank*, No. Civ. 05-73668, 2005 WL 3592009, at *1 (E.D. Mich. Nov. 2, 2005); *Ray v. Williams*, No. CV-04-863-HU, 2005 WL 697041, *1–*2, *5–*6 (D. Or. Mar. 24, 2005). Furthermore, I take judicial notice of the fact that Barton A. Buhtz, whose

---

fictional citizen is the plaintiff in this action and that the real Maureen Bryant, the supposed secured party, is merely intervening on the fiction's behalf.

theories and advice regarding "redemption" and Bills of Exchange were explicitly relied upon by Plaintiff, was recently convicted in Oregon, along with several co-defendants, of criminal fraud charges related to the passing of Bills of Exchange. Jury Verdict, *United States v. Buhtz*, No. 1:05-CR-30047 (D. Or. Oct. 5, 2007). Although Plaintiff's belief in the legitimacy of the so-called "redemption" process appears genuine, and there is no suggestion that she intended to defraud Washington Mutual, she has nonetheless failed to "sufficiently allege facts to allow the Court to infer that all elements of . . . [her] cause[] of action exist." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344–45 (4th Cir. 2006). Specifically, Plaintiff has failed to allege sufficient facts to allow me to infer that she performed in accordance with the terms of the contract.

As an alternative to her argument that the Bill of Exchange was a valid form of payment, Plaintiff argues that "[a]ccording to Commercial Law, if a payment is not going to be honored it must be returned within 72 hours." (Second Am. Compl. ¶ 7.) Because "Washington Mutual DID NOT RETURN the payment as dishonored within 72 hours, in accordance with commercial law, the payment was considered honored." (*Id.* ¶ 28.) In support of this proposition, Plaintiff cites "Supreme Court ruling HALLENBECK v LIEMERT" (*id.* ¶ 7), presumably referring to *Hallenbeck v. Leimert*, 295 U.S. 116 (1935). Like Plaintiff's other citations to legal authority, however, *Hallenbeck* provides absolutely no support for Plaintiff's position. In *Hallenbeck*, the Supreme Court held that a bank had made final, irrevocable payment of five checks to two other banks by failing to give notice that it was dishonoring the checks within the time allowed by the rules of the banking clearinghouse to which two of the banks belonged. *Id.* at 122. Even if *Hallenbeck* is still valid law, which is questionable,[12] the case says nothing about dishonoring a

---

[12] Notably, in the seventy-two years since *Hallenbeck* was decided, it has been cited in exactly one case, and then only for the basic factual proposition that "Federal Reserve Banks have been members of clearinghouses." *NBT Bank v. First Ntn'l Cmty. Bank*, 287 F. Supp. 2d 564, 570 (M.D. Pa. 2003). Indeed, a law review article cites *Hallenbeck* in support of the proposition that "[e]ven decisions of the United States Supreme Court reported with a

mortgage payment from an individual debtor or a supposed 72-hour rule for returning a dishonored negotiable instrument. Indeed, the governing law in *Hallenbeck* appears to have been the rules of the particular banking clearinghouse, which, even if they are still in effect seventy-two years later, are certainly inapplicable to Plaintiff's situation.

Thus, for all of the foregoing reasons, Count One of Plaintiff's Complaint must be dismissed for failing to state a claim upon which relief can be granted.

*Count Two: Intentional Infliction of Emotional Distress*

Count Two of Plaintiff's Complaint alleges that Defendants' actions surrounding the foreclosure constitute the intentional infliction of emotional distress. Under Virginia law, "th[is] tort has four elements that must be proved: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007) (citing *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974)). Although having one's home foreclosed upon is undoubted stressful and emotionally taxing, Plaintiff has failed to sufficiently allege facts to that allow me to infer that all elements of an intentional infliction of emotional distress claim exist.

First, the facts she alleges do not give rise to an inference that Defendants acted with the intent of causing Plaintiff severe emotional distress or that they knew or should have known their actions would cause her severe emotional distress. Furthermore, to state a claim under Virginia law, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 187 (citations omitted). Defendants' alleged conduct is

---

full opinion can recede into obscurity without ever being cited." Francis J. Mootz III, *Legal Classics After Deconstructing the Legal Canon*, 72 N.C. L. Rev. 977, 994 n.58 (1994).

comprised of the sorts of activities typically associated with a foreclosure. (*See* Second Am. Compl. ¶¶ 41–45.) Given that Defendants were within their rights to foreclose on Plaintiff's home because she did not tender valid payment, this conduct does not rise to the requisite level of outrageousness. Accordingly, Count Two of Plaintiff's Complaint must be dismissed for failing to state a claim upon which relief can be granted.

*Count Three: Conspiracy*

The final count of Plaintiff's Complaint alleges a conspiracy. The alleged conspiracy appears to be based on Defendants' overall course of conduct in proceeding with the foreclosure process. In particular, Plaintiff identifies Defendants' failure to respond to any of the numerous so-called "Affidavits of Truth" that Plaintiff sent them in contesting the foreclosure prior to filing the instant lawsuit. These affidavits state Plaintiff's version of various events leading to the foreclosure, including her explanations of why the foreclosure was supposedly unlawful, and conclude with the following:

> Each respondent has ten (10) days in which to rebut this affidavit point-for-point, from receipt of this affidavit, UCC 1-204. A lack of response from each respondent means assent to this affidavit and a fault, UCC 1-201(16) exists creating fraud through material misrepresentation which vitiates all forms, contracts, agreements, etc. express or implied, from the beginning, UCC 1-103.

(Second Am. Compl. ¶ 20.)

Because Defendants did not respond to any of her affidavits, Plaintiff argues that they are now estopped from disputing the truth of her claims.[13] Yet Plaintiff's citations for this proposition are, at best, only tangentially related to her estoppel claim and certainly provide no support for it. As enacted in Virginia, UCC 1-204 states the conditions under which a person

---

[13] Plaintiff asserts that the Court is bound by a variety of "maxims of law," such as "An unrebutted affidavit stands as truth in commerce," and "An unrebutted affidavit becomes the judgment in commerce." (Second Am. Compl. ¶¶ 59–64.) Although some of these "maxims" not related to unrebutted affidavits may generally reflect valid legal principles, Plaintiff offers no authority for the proposition that any of them have the force of binding law.

- 11 -

gives value for rights acquired, UCC 1-201(16) defines "document of title," and UCC 1-103 describes the UCC's "underlying purposes and policies." Va. Code Ann. §§ 8.1A-204, -201(16), -103. None of these provisions suggests that failure to respond to an "Affidavit of Truth" within ten days constitutes an admission that estops one from later disputing the assertions in the affidavit. Indeed, they do not even suggest that Defendants had any legal obligation to respond to Plaintiff's affidavits at all, or that Plaintiff can create such an obligation simply by stating in a document that the obligation exists and then having the document notarized.

Moreover, even if Defendants did have an obligation to respond to Plaintiff's "Affidavits of Truth," Plaintiff offers no explanation of how their failure to do so gives rise to a legally cognizable claim of "conspiracy." The same is true of the other alleged actions of Defendants listed under Plaintiff's conspiracy count. Therefore, Count Three of Plaintiff's Complaint must be dismissed for failing to state a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, Defendants' Amended Motion to Dismiss Plaintiff's Second Amended Complaint will be GRANTED in an Order accompanying this Memorandum Opinion.

Before concluding, however, I wish to offer Plaintiff a word of caution (though, to be clear, I did not consider any of the following in deciding to grant Defendants' motion). Plaintiff has indicated that she has attempted to pay other debts with Bills of Exchange and has also alluded to a belief that there are similarly questionable means by which a person may avoid paying the federal income tax. As I cautioned Plaintiff at oral argument, people frequently end up in prison for pursuing these sorts of schemes. The convictions in Oregon of Barton Buhtz's co-defendants, who, just like Plaintiff, followed Mr. Buhtz's advice regarding Bills of Exchange, should make abundantly clear that Plaintiff is playing with fire.

Instead of relying on Mr. Buhtz's assurances that his conviction will be overturned,[14] Plaintiff would be wise to rely on the statements of the Office of the Comptroller of the Currency and the U.S. Department of the Treasury. *See* OCC Alert 2007-55, Sept. 5, 2007, http://www.occ.treas.gov/ftp/alert/2007-55.html (describing "[t]he use of a nonexistent 'trust account' supposedly held in a person's name at the United States Department of the Treasury or some other part of the federal government" as one of the "fraudulent processes used to . . . 'eliminate' debt"); OCC Alert 2003-12, October 1, 2003, *available at* http://www.occ.treas.gov/altlst03.htm ("Regardless of how such instruments or documents are titled [e.g., a Bill of Exchange] . . . they are worthless, have no legal validity, and are not payable through the United States Treasury, the Secretary of the Treasury, the Comptroller of the Currency, or any other federal or state agency."); OCC Alert 2003-7, May 5, 2003, *available at* http://www.occ.treas.gov/altlst03.htm (same); Bogus Sight Drafts/Bills of Exchange Drawn on the Treasury, http://www.treasurydirect.gov/instit/statreg/fraud/fraud_bogussightdraft.htm (last visited Dec. 18, 2007) ("Drawing [Bills of Exchange] on the U.S. Treasury is fraudulent and a violation of federal law. The theory behind their use is bogus and incomprehensible.").

If Plaintiff remains unconvinced by these government sources, then perhaps she should consider Mr. Buhtz's *own statements*, made through his attorney, to the U.S. District Court for the District of Oregon following his conviction:

- "None of the bills of exchange [on which Mr. Buhtz gave advice] bore *any likelihood of succeeding.* Mr. Buhtz's own expert witness, Dr. Walker F. Todd, testified in essence that the bills of exchange were doomed to fail because *UCC Trust Accounts do not exist.*"

- "If and when the bank *inevitably* failed to honor [one coconspirator's] bill of exchange, [the coconspirator who received the bill] would simply not transfer title to her property, *which is exactly what happened.*"

---

[14] The Oregon district court recently denied his Rule 29 motion for a judgment of acquittal. Order, *United States v. Buhtz*, No. 1:05-CR-30047 (D. Or. Dec. 17, 2007).

- "The testimony of Latanya Wilson and Delores Douglas was the that [*sic*] IRS receives tens of thousands of these types of documents annually and automatically disposes of most of them. This bill of exchange had *absolutely no chance of ever being honored* by the IRS . . . ."

- "Though [the Coos County Treasurer] does not deal with the same volume of bills of exchange as the IRS, *the chance that such a document would be honored to discharge taxes was equally remote – zero.*"

- "[Mr. Buhtz] has a long history of trying to help people, no matter how *misguided* his attempts may have been in this case. . . . [L]ike many others, he was drawn into a *hopeless, unrealistic dream.*"

Defendant Buhtz's Sentencing Memorandum at 10–11, 13, *United States v. Buhtz*, No. 1:05-CR-30047 (D. Or. Dec. 14, 2007) (emphasis added).

Thus, it appears that since his conviction, Mr. Buhtz has disavowed the so-called "redemption" process and its attendant use of worthless Bills of Exchange. I encourage Plaintiff to do likewise.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: *[signature]*
United States District Judge

December 19, 2007
Date

- 14 -
Case 6:07-cv-00015-NKM   Document 61   Filed 12/19/07   Page 14 of 14   Pageid#: 508